*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEGASUS WIND, LLC,

        Plaintiff-Appellant,

v

TUSCOLA COUNTY,

        Defendant-Appellee,

and

TUSCOLA AREA AIRPORT ZONING BOARD OF
APPEALS,

        Intervenor-Appellee.

FOR PUBLICATION
February 24, 2022
9:25 a.m.

No. 355715
Tuscola Circuit Court
LC No. 20-031066-AA

Before: RICK, P.J., and MURRAY and SHAPIRO, JJ.

RICK, P.J.

In this zoning dispute, plaintiff Pegasus Wind, LLC (Pegasus) appeals as of right the Circuit Court's order affirming intervenor Tuscola Area Airport Zoning Board of Appeals' (AZBA) denial of eight variance applications for additional wind turbines. For the reasons stated below, we reverse in part and remand for proceedings consistent with this opinion.[1]

---

[1] In deciding this appeal, we reject Tuscola County's argument that this Court lacks jurisdiction because the circuit court judgment is not appealable as of right under MCR 7.203(A)(1)(a). In *Ansell v Delta Co Planning Comm*, 332 Mich App 451, 453 n 1; 957 NW2d 47 (2020), a recently published decision, this Court held that it does have jurisdiction over such an appeal. Therefore, this argument has no merit. See *id.* (holding that this Court had jurisdiction to hear the issue on appeal because the "case involved a decision by [the] County Planning Commission to grant applications for conditional-use permits for construction of windmills. Accordingly, the appeal in

-1-

## I. BACKGROUND

This controversy has an extensive procedural and factual history involving local regulatory authorities' decisions on a wind energy system being built by Pegasus. Pegasus is constructing a commercial wind energy system in Tuscola County. Some of the planned wind turbines are within the Tuscola Area Airport zoning area. Airport Authority owns the airport and is responsible for maintenance and operation of the landing, navigational, and building facilities. See MCL 259.622. The AZBA is responsible for deciding whether to grant variances from airport zoning regulations. See MCL 259.454.

On June 11, 2019, Pegasus filed applications for variances with the AZBA for 33 proposed wind turbines near the Tuscola Area Airport. The AZBA denied the variance applications. Pegasus appealed the AZBA's denial of the variances to the Circuit Court. In November 2019, the Circuit Court reversed the AZBA's decision.[2]

Relevant to this appeal, on October 22, 2019, Pegasus submitted eight additional variance applications for the construction of eight additional wind turbines. Along with these applications, Pegasus submitted the Federal Aviation Administration's (FAA) determinations of no hazard (DNH) for the proposed wind turbines and a letter from Michigan Department of Transportation (MDOT) confirming that MDOT "concurs with the FAA's determination of no hazard," and that MDOT Tall Structure permits would be issued for the turbines after the variances were granted. Public hearings regarding the variance applications were held on January 13 and 17, 2020. The AZBA denied Pegasus's request for the eight variances on January 17, 2020.

Pegasus appealed the AZBA's denial to the circuit court. In its September 11, 2020 order, the circuit court held that the AZBA's denial was supported by substantial, competent, and material evidence that Pegasus had failed to establish three of the four criteria necessary to permit the AZBA to grant a variance. More specifically, the trial court concluded that Pegasus failed to establish that 1) there is a practical difficulty in the literal enforcement of the ordinance, 2) the variances would not be against the public interest and approach protection, and 3) granting the variances would be in accordance with the spirit of the ordinance. However, the court reversed the AZBA's determination that granting the variances would not do substantial justice, noting that the record "does not contain evidence that the granting of variances would not do substantial justice" and that "[t]here will be no adverse impact to the airport . . ." The circuit court further concluded that the AZBA's denial of the variances on the basis that the grant of such variances

---

the circuit court was not taken from a court or tribunal because the planning commission is not a court and did not act as a tribunal in issuing the permits in question.").

[2] This Court denied the AZBA's application for leave to appeal this order "for lack of merit in the grounds presented." *Pegasus Wind, LLC v Tuscola Area Airport Zoning Bd of Appeals*, unpublished order of the Court of Appeals, entered February 26, 2020 (Docket No. 351915). Our Supreme Court also denied leave to appeal, *Pegasus Wind, LLC v Tuscola Area Airport Zoning Bd of Appeals*, 949 NW2d 696 (Mich, 2020), and denied a subsequent motion for reconsideration, *Pegasus Wind, LLC v Tuscola Area Airport Zoning Bd of Appeals*, 953 NW2d 396 (Mich, 2021).

would not be "in accordance with the spirit of the Ordinance" was also supported by substantial evidence.

Pegasus filed a motion for reconsideration arguing, in part, that the circuit court's determination that there was evidence supporting the substantial justice factor, but not the remaining three factors, was internally inconsistent, which the circuit court subsequently denied.

This appeal followed.

## II. STANDARD OF REVIEW

"In general, we review de novo a circuit court's decision in an appeal from a ZBA decision because the interpretation of the pertinent law and its application to the facts at hand present questions of law." *Hughes v Almena Twp*, 284 Mich App 50, 60; 771 NW2d 453 (2009) (citations omitted). However, this Court gives "great deference to the trial court and zoning board's findings." *Norman Corp v City Of East Tawas*, 263 Mich App 194, 198; 687 NW2d 861 (2004). The underlying interpretation and application of an ordinance is also reviewed de novo. *Detroit v Detroit Bd of Zoning Appeals*, 326 Mich App 248, 254; 926 NW2d 311 (2018). As stated in *Risko v Grand Haven Charter Twp Zoning Bd of Appeals*, 284 Mich App 453, 458; 773 NW2d 730 (2009):

> When reviewing a zoning board's denial of a variance this Court must review the record and the board's decision to determine whether it (1) comports with the law, (2) was the product of proper procedure, (3) was supported by competent, material, and substantial evidence on the record, and (4) was a proper exercise of reasonable discretion. [Cleaned up.]

"This Court reviews the circuit court's determination regarding [a zoning board of appeals (ZBA)] findings to determine whether the lower court applied correct legal principles and whether it misapprehended or grossly misapplied the substantial evidence test to the ZBA's factual findings." *Hughes*, 284 Mich App at 60 (quotation marks and citation omitted). The substantial-evidence test standard "is the same as the familiar 'clearly erroneous' standard. A finding is clearly erroneous if the reviewing court, on the whole record, is left with the definite and firm conviction that a mistake has been made." *Id.* "The substantial evidence test also encompasses a quantitative component." *Id.* at 61. " 'Substantial evidence' is evidence that a reasonable person would accept as sufficient to support a conclusion. While this requires more than a scintilla of evidence, it may be substantially less than a preponderance." *Id.* (quotation marks and citation omitted).

## III. ANALYSIS

An airport zoning board of appeals must grant a variance if the applicant establishes the statutory factors for a variance delineated in the Michigan Airport Zoning Act, MCL 259.431, *et seq*. The Tuscola Area Airport Zoning Ordinance (the Tuscola Ordinance) also identifies the

factors that the AZBA must apply when considering variance applications. Tuscola Ordinance 5.2G(2).[3] The Airport Zoning Act provides:

> A person desiring to erect a structure, or increase the height of a structure, or permit the growth of a tree, or otherwise use property in violation of the airport zoning regulations adopted under this act, may apply to the board of appeals, for a variance from the zoning regulations in question. The board of appeals *shall* allow a variance if a literal application or enforcement of the regulations would result in practical difficulty or unnecessary hardship and the relief granted would not be contrary to the public interest, but would do substantial justice and be in accordance with the spirit of the regulations. However, a variance may be granted subject to any reasonable condition or condition subsequent that the board of appeals considers necessary to effectuate the purposes of this act. A variance shall not conflict with a general zoning ordinance or regulation of a political subdivision.

---

[3] In contrast to the Airport Zoning Act, the Tuscola Ordinance mandates that the AZBA grant a variance if a petitioner establishes any *one* of the factors, as long as the FAA and the Michigan Aeronautics Commission has issued permits or determinations of non-hazard. The Tuscola Ordinance also adds one alternative sub-factor, regarding flight approach protection, which reads, in pertinent part:

> In acting upon applications for variance, a variance can be granted on the condition that

> The Federal Aeronautics Administration (FAA) and the Michigan Aeronautics Commission (MAC) has issued a permit or determination of non-hazard . . . .

> \* \* \*

> In addition, variances *shall* be allowed for *any* of the following reasons:

> (a) A literal application or enforcement of the regulation would result in practical difficulty or unnecessary hardship;

> (b) Relief granted would not be contrary to the public interest *and approach protection*;

> (c) Relief granted would do substantial justice;

> (d) Relief granted would be in accordance with the spirit of the regulations of this Ordinance.

>  . . . Nothing in this section shall be construed to permit a use that would conflict with any general zoning ordinance or regulation of any political subdivision in the same area. [Tuscola Ordinance 5.2.(G)(2) (emphasis added).]

However, a variance may conflict with a zoning ordinance or regulation adopted exclusively for airport zoning purposes.  [MCL 259.454(1) (emphasis added).]

Therefore, under the controlling statute, an airport zoning board of appeals is required to grant a variance if the applicant fulfills all four factors: (1) "a literal application or enforcement of the regulations would result in practical difficulty or unnecessary hardship;" (2) "the relief granted would not be contrary to the public interest;" (3) the relief granted "would do substantial justice;" and (4) the relief granted would be "in accordance with the spirit of the regulations." MCL 259.454(1).

The Airport Zoning Act and the Tuscola Ordinance does not distinguish "nonuse variances" and "use variances."  However, the Michigan Zoning Enabling Act, MCL 125.3101 *et seq.*, provides some clarity.  "Under the *in pari materia* doctrine, statutes that relate to the same subject or that share a common purpose should, if possible, be read together to create a harmonious body of law." *Hegadorn v Dep't of Human Servs Dir*, 503 Mich 231, 264; 931 NW2d 571 (2019) (quotation marks, citation, and alteration omitted).  The Michigan Zoning Enabling Act provides the procedure for zoning board of appeals, which is analogous to the AZBA under the Airport Zoning Act.  See MCL 125.3604.  MCL 125.3604(8) provides, "The zoning board of appeals of all local units of government shall have the authority to grant *nonuse variances relating to the construction, structural changes, or alteration of buildings or structures related to dimensional requirements* of the zoning ordinance or to any other nonuse-related standard in the ordinance." (Emphasis added).  This Court has also recognized that "[u]se variances permit a use of the land which the zoning ordinance otherwise proscribes," while "nonuse variances" are those variances concerned with the area, height, and setback requirements of structures.  *Nat'l Boatland, Inc v Farmington Hills Zoning Bd of Appeals*, 146 Mich App 380, 387; 380 NW2d 472 (1985).[4] Additionally, MCL 125.3604(7) indicates that "practical difficulties" is the applicable standard for nonuse variances and "unnecessary hardship" applies to use variances.  Considering these principles, Pegasus appears to have sought nonuse variances for the construction of the eight wind turbines.

### A.  SIMILAR OUTCOMES

Pegasus, although recognizing that the circuit court had an obligation to review the whole record, argues that the outcome of this case should be identical with its previous appeal concerning the circuit court's reversal of the AZBA's denial of the variance requests for 33 wind turbines because the record and arguments are identical.  We disagree.

According to our Supreme Court, the Michigan Constitution requires "a thorough judicial review of [an] administrative decision." *In re Payne*, 444 Mich 679, 693; 514 NW2d 121 (1994) (quotation marks and citation omitted).  Review of an administrative decision

---

[4] "Although cases decided before November 1, 1990, are not binding precedent, MCR 7.215(J)(1), they nevertheless can be considered persuasive authority." *In re Stillwell Trust*, 299 Mich App 289, 299 n 1; 829 NW2d 353 (2012).

considers the whole record—that is, both sides of the record—not just those portions of the record supporting the findings of the administrative agency. Although such a review does not attain the status of *de novo* review, it necessarily entails a degree of qualitative and quantitative evaluation of evidence considered by an agency. Such review must be undertaken with considerable sensitivity in order that the courts accord due deference to administrative expertise and not invade the province of exclusive administrative fact-finding by displacing an agency's choice between two reasonably differing views. [*Id.* (quotation marks and citation omitted).]

Regardless of the similarity to the record in the previous appeal, the record in the instant case is different. The eight turbines in this case were in different locations. Because Pegasus already had variances approved for 33 turbines at the time it sought these variances, the AZBA's decision was made in an entirely different context than its previous denial. Under these circumstances, neither the AZBA's decision, nor the circuit court's determination on appeal were prescribed by the previous appeal. Further, Pegasus failed to provide any legal citation to support its contention that the outcome of the previous appeal required the AZBA to authorize the variances or the circuit court to reverse the denials in this case. "When a party merely announces a position and provides no authority to support it," this Court may consider the issue waived. *Nat'l Waterworks, Inc v Int'l Fidelity & Surety, Ltd*, 275 Mich App 256, 265; 739 NW2d 121 (2007). The circuit court's reversal in the previous appeal did not require that it also reverse the AZBA's denial for the eight turbines in the instant case. Therefore, the trial court did not err in this regard.

## B. PRACTICAL DIFFICULTY

As indicated, under the Airport Zoning Act, the AZBA is required to grant a variance "if a literal application or enforcement of the regulations would result in practical difficulty or unnecessary hardship and the relief granted would not be contrary to the public interest, but would do substantial justice and be in accordance with the spirit of the regulations." MCL 259.454(1); see Tuscola Ordinance 5.2.(G)(2). Accordingly, if an applicant makes the proper showing, granting of the variance is not discretionary.

The term "practical difficulty" is not defined in the Airport Zoning Act or in the Tuscola Ordinance, and there is no Michigan caselaw that interprets the practical difficulty factor for purposes of airport zoning. However, a similar standard was required for use and nonuse variances under MCL 125.585, repealed by 2006 PA 110, which required a showing of "practical difficulties or unnecessary hardships in carrying out the strict letter of the ordinance . . ." See *Norman Corp*, 263 Mich App at 202.[5] "In general, 'or' is a disjunctive term, indicating a choice between two

---

[5] Many of the general zoning cases cited by the circuit court and by the parties on appeal predate the 2006 enactment of the Michigan Zoning Enabling Act. The cases that predate the enactment did not typically differentiate between "practical difficulty" and "unnecessary hardship" because the prior zoning law allowed variances for both reasons. See MCL 125.585, repealed by 2006 PA 110. Since 2006, the term "practical difficulty" applies only to nonuse variances, and the term "unnecessary hardship" applies only to use variances. MCL 125.3604(7). Consequently, the

alternatives . . ." *Paris Meadows, LLC v City of Kentwood*, 287 Mich App 136, 148; 783 NW2d 133 (2010). Furthermore, under the Zoning Enabling Act, only a showing of practical difficulty, and not unnecessary hardship, is required to justify the grant of a nonuse variance. MCL 125.3604(7); see *Heritage Hill Ass'n, Inc v Grand Rapids*, 48 Mich App 765, 769; 211 NW2d 77 (1973) (holding that only a showing of practical difficulty, and not unnecessary hardship, is required to justify the grant of a nonuse variance).

This Court has held that, in determining whether a practical difficulty exists, we consider "whether the denial deprives an owner of the use of the property, compliance would be unnecessarily burdensome, or granting a variance would do substantial justice to the owner." *Norman Corp*, 263 Mich App at 203. The use of the term "or" indicates that Pegasus need only meet one of these standards. See *Paris Meadows, LLC*, 287 Mich App at 148. However, practical difficulties cannot be self-created. *Norman Corp*, 263 Mich App at 202. Therefore, the issue is whether the denial of the variance deprived Pegasus of the use of the property or whether compliance would be unnecessarily burdensome. In addition, even if Pegasus has shown entitlement under either of these standards, this Court must consider whether the practical difficulty was self-imposed.

In its determination that Pegasus had not shown that a literal interpretation or enforcement of the height requirements could result in a practical difficulty for Pegasus with respect to the eight proposed turbines, the AZBA stated:

> In particular, Pegasus Wind has not provided sufficient evidence to establish that the wind project is not financially viable if shorter wind turbines are used or if fewer wind turbines are used and has not established the unavailability of shorter turbines with anything more than conclusory statements. Pegasus Wind has also failed to provide sufficient evidence that potential, alternate locations are not viable options for these eight (8) proposed turbines. Pegasus Wind has also failed to show that denial of the variances would deprive it of use of the property. The property at issue has other uses, particularly agricultural issues.

> Any practical difficulty to Pegasus Wind from its claimed inability to meet its obligations under a Power Purchase Agreement without the variances and/or based on expenditures made by Pegasus Wind turbine construction is self-created and not a proper basis to grant a variance.

> Finally, the practical difficulty on which Pegasus Wind bases its application for variances is not inherent in the land and not the result of a unique characteristic of the land.

The circuit court concluded that the AZBA's denial of the variances based on Pegasus's failure to establish that there was a practical difficulty in the literal enforcement of the ordinance was supported by competent, material, and substantial evidence. Because there appears to be confusion

---

general zoning cases that interpret the former zoning law are not binding, but are persuasive regarding the "practical difficulty" factor.

between the requirements of practical difficulty and unnecessary hardship, we use this case as an opportunity to distinguish those requirements in the application of variances.

## 1. INHERENT IN THE LAND

Considering the third basis first, the AZBA found that the practical difficulty on which Pegasus relied was neither inherent in the land nor the result of a unique characteristic of the land. However, the requirement of showing unique circumstances inherent in the property is not an element of practical difficulty, but of unnecessary hardship. See, e.g., *Detroit v Detroit Bd of Zoning Appeals*, 326 Mich App 248, 261; 926 NW2d 311 (2018) (setting forth the requirements for proving a hardship); *Norman Corp*, 263 Mich App at 203 ("Alternatively, this Court has granted variances where an unnecessary hardship existed that was unique to the property.") However, because Pegasus was seeking a nonuse variance, it was only required to establish a practical difficulty. See MCL 125.3604(7); *Norman Corp*, 263 Mich App at 203; *Heritage Hill*, 48 Mich App at 769.

The county asserts that "practical difficulty" relates to problems inherent in the property itself, citing a footnote in *Davenport v Grosse Pointe Farms Bd of Zoning Appeals*, 210 Mich App 400, 403 n 1; 534 NW2d 143 (1995), which provides:

> Defendant's concession that a "practical difficulty" exists under plaintiffs' circumstances is limited solely to these proceedings. Usually, the concept of "practical difficulty" in zoning law relates to problems inherent in the property itself, not to the personal conditions of its occupants. See Crawford, Michigan Zoning and Planning (3d ed), § 6.03, pp 164-165.[6]

The county then argues that the practical difficulties asserted by Pegasus are personal to Pegasus and "its desire to use the properties for a unique purpose," not any unique aspect of the properties themselves.

In affirming the AZBA's determination, the circuit court adopted this position:

> It is Appellees['] contention that Pegasus' arguments relate solely to their financial bottom line, when Pegasus argued that using shorter turbines would be "less efficient" and requiring Pegasus to "site more turbines" would be "at the very least, unnecessarily burdensome, and at most detrimental to the Project's overall economic vitality." [The] AZBA states that these arguments are not related to any practical difficulty with the property.

> \* \* \*

> Appellees insist that Pegasus does not identify anything unique about the parcels for which the variances are being requested. . . . .

---

[6] We note that *Davenport* predates the 2006 enactment of the Michigan Zoning Enabling Act.

The Appellees cite to case law which states[,] "The concept of 'practical difficulty' in zoning law relates to problems inherent in the property itself, not the personal conditions of its occupants." "The hardship must be unique or peculiar to the property for which it is sought."

Accordingly, the circuit court expressly adopted the position found in the *Davenport* footnote. However, in doing so, the court confused practical difficulty with unnecessary hardship. Indeed, this is even more clear from its second quotation which expressly notes that it is *hardship*, not practical difficulty, that must be unique to the property for which it is sought. Further, although an unpublished opinion of this Court has indicated that this is a consideration when analyzing practical difficulty, see e.g., *Jacques v Dep't of Environmental Quality*, unpublished per curiam opinion of the Court of Appeals, issued August 23, 2007 (Docket No. 268016), p 5, unpublished cases are not binding on this Court. MCR 7.215(J)(1).

We recognize that *Davenport* is published. Therefore, defendants and the circuit court were not without some support for their contention that Pegasus was required to establish that "the practical difficulty [was] unique to the property itself." However, the law is clear that practical difficulty and unnecessary hardship are two separate things, and being unique to or inherent in the property is a requirement of hardships, not practical difficulty. See *Norman Corp*, 263 Mich App at 203; *Heritage Hill Ass'n*, 48 Mich App at 769. Further, the Michigan Zoning Enabling Act, which provides that "practical difficulty" applies only to nonuse variances, while "unnecessary hardship" applies only to use variances, further supports our conclusion that practical difficulty and unnecessary hardship are two distinct and separate standards. MCL 125.3604(7). Accordingly, we reject the arguments relying on the conflated standards. Moreover, because the AZBA cannot require Pegasus to establish the hardship requirements, the last reason provided by the AZBA, as well as its contention that all of Pegasus's arguments are financial and, therefore, do not apply to the land, cannot support its denial of the variances on the basis of "practical difficulty."

## 2. DEPRIVATION OF USE/ UNNECESSARILY BURDENSOME

We note that neither the AZBA's findings nor the circuit court addressed the "deprivation of use" and the "unnecessarily burdensome" factors separately. Therefore, we address both factors together.

The AZBA determined that Pegasus had not provided sufficient evidence to establish that the wind project was not financially viable if shorter or fewer turbines were used, and did not establish that shorter turbines were unavailable "with anything more than conclusory statements." However, the record from the previous variance denial appeal was part of the instant record, and that record clearly established both of these things as recognized in the trial court's order in the prior appeal regarding the 33 variances. In addition, Pegasus noted that it was not required to establish that the use of alternative turbines or other locations was impossible.

In affirming the AZBA, the circuit court held:

Pegasus argues that to comply with the Ordinance by using shorter turbines "would be unnecessarily burdensome and possibly detrimental to the Wind

Project's economic viability." Pegasus explained that it could not use shorter turbines because "virtually all commercial wind turbines sold on the market and used by developers like Pegasus Wind today are in excess of 400 feet" and would be in violation of the height limitations in the Ordinance. Pegasus is purchasing turbines from GE and the shortest commercial turbine actively produced by GE has a height of 486 feet at the tip. Further, the shorter "special purpose" turbines are taller than 400 feet.

Pegasus also notes that the turbines that are shorter than 400 feet would be less efficient than the taller counterparts, which would require Pegasus to site more turbines to produce the megawatt total needed for compliance with its Power Purchase Agreements (PPAs). The township zoning ordinance limits the distances between turbines and turbines being in proximity to homes and property lines. For Pegasus to be in compliance with the Ordinance in this manner would be unnecessarily burdensome, and at most, detrimental to the Project's overall economic viability.

Further, using fewer turbines is not a viable option because "Pegasus Wind cannot comply with its Power Purchase Agreements (PPAs) and its Interconnect Agreement if these variances are not granted." This means that Pegasus Wind would not be able to meet its output requirements. If Pegasus Wind cannot meet the output requirements of these PPAs, Pegasus Wind customers have the right to unilaterally and completely cancel the PPAs.

It is Appellees['] contention that Pegasus' arguments relate solely to their financial bottom line, when Pegasus argued that using shorter turbines would be "less efficient" and requiring Pegasus to "site more turbines" would be "at the very least, unnecessarily burdensome, and at the most, detrimental to the Project's overall economic viability." AZBA states that these arguments are not related to any practical difficulties with the property.

However, by attaching all of these arguments to whether they were related to practical difficulties unique to the property, the AZBA and the circuit court have cut off any utility to these findings because, as previously noted, caselaw contains no "unique to the property" requirement for practical difficulties.

Although not in its resolution, on appeal, the AZBA argues that Pegasus was not unnecessarily burdened by the ordinance because it could "use each of the parcels in the exact same manner after the variance was denied as it could before the variance was denied." However, this statement has no value to the AZBA's position, because it is merely a truism that applies to most any denial of a variance, unless it was sought for a prior nonconforming use. That is, if a party has no viable use before a variance request, it still has no viable use after its denial. That is the entire point of the question of whether there is any economic viability to the property. Here, Pegasus has no use for the land without the variance because its lease agreements all relate to the placement and use of turbines. The AZBA has relied on the agricultural nature of the parcels to assert continued economic use. However, Pegasus does not own those parcels and its leases do not permit alternate uses for the properties. Therefore, the AZBA's truism only highlights

Pegasus's position—the denial of the variances have rendered its lease agreements valueless and prohibited any use of its interest in the various properties.

### 3. SELF-CREATED DIFFICULTY

Lastly, the AZBA concluded that any practical difficulty was self-created by Pegasus. A person seeking a variance is required to show that the condition giving rise to the need for the variance was not self-created. *Detroit Bd of Zoning Appeals*, 326 Mich App at 261. In affirming the AZBA's determination that any hardship that existed in this case was self-created, the circuit court held:

> Appellees argue that, in this case, Pegasus complains that it cannot use the land in the manner it chooses, and that use is driven by the Power Purchase Agreements that it chose to enter into before it sought the necessary variance. The Power Purchase Agreements are unrelated to the subject parcels. The AZBA found that if the agreements create a hardship, that hardship was created by Pegasus.
>
> . . . Pegasus Wind has explained this project requires that a developer enter into agreements at the outset of the project to ensure financial viability, and requires the local zoning requirements be met, which requires a developer to have a site plan based on finalized lease agreements before obtaining permits.
>
> Appellees present case law which states that a hardship is deemed self-created, and an applicant is not entitled to a variance, if the property in question has a reasonable use under the ordinance but the acts of the applicant render the property unfit for the desired use. It further states that to determine if a hardship is self-created, one should examine if the hardship which the variance is seeking to remedy is created by the applicant, or by the current zoning ordinance, [and] if the property can "reasonably be used in a manner consistent with existing zoning," then the hardship is created by the applicant.
>
> Appellees conclude that there is no question that the property has an economic use as it is currently zoned for agricultural use. Therefore, any hardship that Pegasus alleges in its variance application is self-created by Pegasus' desire to use the property in a different manner.

The circuit court cited *Detroit Bd of Zoning Appeals* as support. However, *Detroit Bd of Zoning Appeals* does not support this result.

Looking first at the county's argument, which mirrors that adopted by the circuit court, it argues that a hardship[7] can be deemed self-created when the disputed parcels can be used in a

---

[7] We note that in *Detroit Bd of Zoning Appeals* this Court considered the grant of a hardship variance, not practical difficulty. See *Detroit Bd of Zoning Appeals*, 326 Mich App at 252. Although *Detroit Bd of Zoning Appeals* considers the self-creation of hardships, because practical

-11-

manner consistent with the existing zoning even if the use is not the use desired by the applicant. The portion of *Detroit Bd of Zoning Appeals* on which the county and the circuit court rely is this Court's consideration of two previous cases: *Cryderman v City of Birmingham*, 171 Mich App 15; 429 NW2d 625 (1988), in which a denial was upheld, and *Janssen v Holland Charter Twp Zoning Bd of Appeals*, 252 Mich App 197; 651 NW2d 464 (2002), in which an approval was upheld. *Detroit Bd of Zoning Appeals*, 326 Mich App at 264-265.

In *Cryderman*, the plaintiffs had purchased a lot on which they resided, with two adjacent unplatted lots used as a side yard and lawn for their residential lot. *Detroit Bd of Zoning Appeals*, 326 Mich App at 264. When the plaintiffs later created a proposal to develop the property, they sought a hardship variance to permit them to sell the two unplatted lots as building sites, which the zoning board of appeals denied. *Id.* This Court upheld the denial, concluding that the unplatted properties retained their usefulness as a side yard and lawn under the current zoning ordinance and it was only the plaintiffs' proposal to develop the property in contravention of the zoning ordinance that resulted in the hardship, rendering it self-created. *Id.*

Although this initially appears to support the county's position, there is a significant difference. When the plaintiffs in *Cryderman* first purchased their lot, the adjacent unplatted lots had value and use to them *at that time*—as a side yard and lawn. That the plaintiffs *later* sought to change the nature of the use of the unplatted lots is what rendered their hardship self-created. In this case, Pegasus entered into the leases with the landowners *solely* for the purpose of creating a wind farm. The parcels have no other utility to Pegasus, and the parcels have never had any other use to Pegasus. Therefore, Pegasus is in an entirely different position from that of the plaintiffs in *Cryderman*.

The second case considered in *Detroit Bd of Zoning Appeals* is *Janssen,* 252 Mich App at 197. In *Janssen*, the landowners sought to rezone 100 acres of property and successfully argued to the ZBA that the current agricultural zoning created an unnecessary hardship "because rising property taxes caused the land's zoned uses to no longer be economically viable such that the land could not 'reasonably be used in a manner consistent with existing zoning.' " *Detroit Bd of Zoning Appeals*, 326 Mich App at 265, quoting *Janssen*, 252 Mich App at 199, 201. This Court determined that the evidence supported the finding that the hardship was not the result of the landowners' own actions. *Detroit Bd of Zoning Appeals*, 326 Mich App at 265. " 'The increasing taxable value and the comparatively low rental income derived are not "self-created" burdens.' " *Id*., quoting *Janssen*, 252 Mich App at 202-203. The outcome in *Janssen* is more akin to the current situation. That the land within the airport's zoning area sits precisely in the one area where all of the requirements for a wind farm can be found is not a self-created burden. Accordingly, the cases in *Detroit Bd of Zoning Appeals* on which the county relies actually support a determination that the practical difficulties in this case were not self-created.

Turning to the AZBA's position, its entire argument is that Pegasus entered into the agreements with the landowners without seeking the variances first and that, even if Pegasus was somehow required to do so, it entered into the agreements "fully aware of the existing [o]rdinance."

difficulties are also not permitted to be self-created, *Norman Corp*, 263 Mich App at 202, these cases are applicable for the self-creation analysis.

However, this argument lacks merit. Although *Detroit Bd of Zoning Appeals* considered unnecessary hardships rather than practical difficulties, *Detroit Bd of Zoning Appeals* explicitly held that simply purchasing land, or an interest therein, with knowledge that the land is subject to an ordinance's applicable restriction *is not* a self-created hardship. *Detroit Bd of Zoning Appeals*, 326 Mich App at 261-262. Rather, this Court concluded that "a zoning board must deny a variance on the basis of the self-created hardship rule when a landowner or predecessor in title partitions, subdivides, or somehow physically alters the land *after* the enactment of the applicable zoning ordinance, so as to render it unfit for the uses for which it is zoned." *Id*. at 261. There is no evidence in the record that the landowners or Pegasus has partitioned, subdivided, or physically altered the parcels in some way that rendered them unfit for their uses. Therefore, denial on the basis of the self-created-hardship rule was not mandated. See *id*.

To reiterate, this is not a case in which Pegasus purchased the lots for agricultural use and subsequently sought to use it some other way. Pegasus leased these properties because they sit in the sole place where all of the conditions necessary for building a wind farm are found together. It entered into the agreements for the sole purpose of being able to use the land for the wind farm. Neither its awareness of the ordinance, nor the ability of the landowners to use their properties for agricultural purposes under the current zoning is relevant. The question is whether Pegasus has any use for this land under the current zoning—it does not—and whether entering into the agreements with knowledge that the land was subject to the zoning ordinance rendered these hardships self-created—also no. Accordingly, none of the AZBA's three stated reasons for concluding that Pegasus failed to establish a practical difficulty is supported by the record, let alone supported by substantial evidence, and the circuit court misapplied the practical difficulty standard. Therefore, we conclude that the circuit court erred by affirming this determination.

## C. PUBLIC INTEREST

We conclude that the circuit court also erred by affirming the AZBA's determination that the variances would be contrary to the public interest and approach protection.

In support of its determination that granting the eight variances would be contrary to public safety and approach protection, the AZBA's resolution provided:

> Although approach protection was part of the consideration under the FAA's study of the turbine at issue, the FAA Determinations of No Hazard are not dispositive. The FAA looks only at substantial impacts taking into account the frequency of certain flights and approaches. Risks and flight limitations not deemed substantial or significant by the FAA will result from the proposed wind turbines, including:
>
> a. The wind turbines pose a danger to pilots during in-flight emergencies which are by nature unpredictable.
>
> b. VFR pilots will be unable to comply with 14 CFR 91.155 VFR visibility and cloud clearance criteria in the vicinity of the wind turbines when the flight visibility is less than 3 statute miles or the cloud ceiling is less than 1400 feet, while remaining in compliance with the minimum flight altitudes specific in 14 CFR

-13-

91.119. This would require VFR pilots flying in those conditions to circumnavigate the wind turbines and approach the airport from another direction, resulting in a choke point, as well as causing conflict with IFR[8] pilots conducting a published RNAV instrument approach procedure to the airport for landing. This adversely affects VFR operations and is a safety issue.

c.      The wind turbines require a 300-foot increase in minimum descent altitude for the VOR/DME-A approach and landing, requiring pilots using this approach to visualize the runway from a greater distance and creating additional risk. While the VOR/DME-A approach is not frequently used, not all IFR certified aircraft are equipped to conduct more precise approaches preferred by the FAA.

d.      Primary radar transmitted from an air traffic control facility is impacted by wind turbines. Since many VFR general aviation aircraft are not equipped with a transponder or ADS-B surveillance technology, air traffic control must rely on primary radar to locate these VFR aircraft. The wind turbines' interference with primary radar will impact air traffic control's ability to determine if these non-equipped VFR aircraft are airborne near the Tuscola Area Airport.

Additionally, the variances are not in the public interest because they jeopardize the Tuscola Are Airport's ability to meet current or future federal grant assurances. Grants issued pursuant to the National Plan of Integrated Airport Systems and the Airport Improvement Plan require grant recipients to provide certain assurances when accepting a grant, including that the airport will take the actions necessary to protect instrument and visual operations, to protect approaches and prevent the establishment of future airport hazards. The Tuscola Area Airport has received federal grants requiring these assurances and plans to seek additional grants in the future.

There is also no evidence that the energy that will be generated by the Project is needed or would be utilized in the surrounding community.

In affirming the AZBA's denial, the circuit court stated, in part:

Pegasus presented evidence that the FAA conducted a study involving technicians from more than 10 different government offices who each reviewed the project to ensure that it will not interfere with their specific area of air navigation and safety. The FAA conducted additional aeronautical study over a period of more than 1 year and considered and analyzed the impact on "existing and proposed arrival, departure, and en route procedures for aircraft operating under both visual flight rules and instrument flight rules, the impact on all existing and planned public-use airports, military airports, and aeronautical facilities, and the cumulative impact resulting from the studied structure when combined with the impact of other

---

[8] "IFR" refers to pilots using instrument flight rules, meaning that the pilot used devices in the aircraft to measure the attitude and altitude.

existing or proposed structures." The FAA concluded that "the structures would have no substantial adverse effect on the safe and efficient utilization of the navigable airspace by aircraft or on the operation of air navigation facilities," and issued DNHs for the project.

The DNHs state, "Therefore, it is determined that the proposed construction would not have a substantial adverse effect on the safe and efficient utilization of the navigable airspace by aircraft or [o]n any navigation facility and would not be a hazard to air navigation providing the conditions set forth in the determination are met."

The circuit court then quoted the AZBA's resolution. The court acknowledged the FAA's determination, but noted that one of Pegasus's experts explained that the term "hazard" is a term of art used by the FAA to "differentiate between what the FAA deems to be acceptable and unacceptable risks" and that the FAA would not find a hazard "unless the 'adverse effect' exceeds one operation per day, or 365 operations in a year." Defendants acknowledged the FAA's determination that the turbines would require a 300-foot increase in circling minimum descent altitude (MDA), but argued that the FAA did not consider this significant "because other more precise instrument procedures are preferred by the FAA." Defendants contended that the higher minimum descent altitude "makes it more difficult to see the runway in reduced visibility conditions and that the turbines will limit when pilots can fly, as pilots will not be able to land in lower visibility conditions."

Defendants also cited concerns that VFR pilots would be "forced to circumnavigate the turbines in reduced visibility conditions . . . creat[ing] a 'choke point' near the airport" that would conflict with IFR pilots and create a safety issue. The circuit court explained that public comment by Josh Heinlein formed the basis of this finding. Heinlein was a commercial pilot who frequently used the Caro Airport to pilot a private plane. Heinlein "presented evidence regarding the difficulties that these turbines would present to a pilot utilizing VFR" and the circuit court noted that 85% of flights into and out of the Caro Airport were under VFR. The circuit court also found that the AZBA's concerns about primary radar being impacted by the turbines, affecting air traffic control's ability to determine if VFR aircraft without transponders were flying near the airport, were expressed during public comment by local pilot Richard Koerner. The circuit court, citing *Polktown Charter Twp v Pellegrom*, 265 Mich App 88, 94; 693 NW2d 170 (2004), acknowledged that zoning boards of appeals are permitted to consider public comments as relevant evidence, "but public comments that are unsubstantiated, speculative, or unauthoritative do not provide competent evidence to deny the variance."

The circuit court noted that Pegasus refuted that the turbines would jeopardize any current or future ability to meet grant assurances, arguing that because federal grant money came from the FAA and the FAA had determined that the turbines were not hazardous to the airport, the FAA would not claim the turbines constituted a violation of the assurances. Further, Pegasus agreed that if grants were affected, it would indemnify the airport for up to five years for the $2.6 million in grant money that the airport received from the FAA. Nevertheless, the circuit court concluded that the AZBA's decision was supported by competent, material, and substantial evidence on the record.

## 1. STANDARD OF REVIEW DISPUTE

On appeal, Pegasus argues that the circuit court erred in its analysis because it "engaged in little substantive analysis" to reach its conclusion, and instead it "repeated the parties' arguments without explaining which argument prevailed or the strength and weaknesses of each." The AZBA contends that Pegasus "would prefer this Court give weight to only its experts and the FAA and none to the arguments made by members of the public" and that Pegasus incorrectly framed the circuit court's role, "which is not to evaluate the weight or credibility of the record evidence, but to determine whether substantial evidence exists." The AZBA further argues that there is no requirement that the circuit court independently weigh each sides' argument and determine "which one prevails."

As the fact-finder, the AZBA's factual findings must be given deference. *Norman Corp*, 263 Mich App at 198. However, this Court must determine whether the circuit court applied the correct legal standard, or "misapprehended or grossly misapplied the substantial-evidence test" to the AZBA's findings. *Hughes*, 284 Mich App at 60. Moreover, according to our Supreme Court, the circuit court was required to

> consider[] the whole record—that is, both sides of the record—not just those portions of the record supporting the findings of the administrative agency. Although such a review does not attain the status of de novo review, it necessarily entails a degree of qualitative and quantitative evaluation of evidence considered by an agency. [*In re Payne,* 444 Mich at 693.]

This Court has also recognized that the substantial-evidence test includes a qualitative component. *Hughes*, 284 Mich App at 61. Thus, both the circuit court and this Court must engage in some weighing of the evidence. Further, a determination that the record contains substantial evidence is a determination that a *reasonable person* would accept that evidence as sufficient to support a conclusion. *Id.* As stated, the substantial evidence test is equated with the "clearly erroneous" standard. *Id.* at 60. "A finding is clearly erroneous if the reviewing court, on the whole record, is left with the definite and firm conviction that a mistake has been made." *Id.* Likewise, the evidence is not substantial if a reasonable person, on the whole record, would not accept that evidence as sufficient to support its conclusion. *Id.* at 61.

## 2. REVIEW OF THE EVIDENCE

Pegasus notes that the sole evidence analyzed by the circuit court was the public comments made by two local pilots and refutes the circuit court's determination that their comments constituted competent evidence. More specifically, Pegasus challenged Heinlein's allegation that VFR pilots would have to circumnavigate the turbines in reduced visibility conditions, causing a choke point near the airport that would create a safety issue. According to Pegasus, Heinlein provided no data to support his assertions, while Pegasus's expert from Capitol Airspace, who formed his opinion on the basis of statistical analysis and "his unique expertise in analyzing the impact of tall structures on aviation safety," explained that, using Capitol Airspace's historical analysis, VFR pilots did not fly in reduced visibility conditions, so there would be no change in operations that would create the alleged choke point. Pegasus's wind expert also explained that even if VFR pilots were flying in reduced visibility conditions, the eight variances (turbines) would

-16-

have no impact on VFR pilots because the pilots would already have to circumnavigate the existing structures and turbines in the northwest quadrant of the airport area. Lastly, the expert explained that air traffic control processes are in place to ensure that safety is not affected in the event that VFR pilots must circumnavigate the turbines.

Pegasus also challenges Koerner's assertion that the primary radar would be impacted by the turbines, which allegedly would then affect air traffic control's ability to determine if VFR aircraft without transponders were flying near the airport. First, counterintuitively, "primary" radar is a "backup" type of radar, while "secondary" radar is the "primary tool for providing air traffic services in the United States." Second, Koerner admitted that his concerns were speculative and deferred to Capitol Airspace's expertise in the area. Capitol Airspace stated that the FAA had studied the turbines' impact on multiple radar systems, including primary radar, and concluded that, although the turbines would create "clutter" on the radar, the clutter would not impact operations at the airport for VFR aircraft or otherwise. In addition, VFR aircraft without a transponder rely on counter traffic advisory frequency, or radio, "not radar, for the safe separation from themselves from other VFR aircraft or IFR aircraft." Thus, Pegasus asserts, the only competent evidence in the record demonstrates that the turbines' impact on primary radar would not affect approach protection, while the public comments were speculative and unsubstantiated. Pegasus also contends that the circuit court had expressly rejected the AZBA's other arguments related to in-flight emergencies and risk from raising the MDA in its decision to reverse the denial of the 33 variances.

The AZBA argues that it was "free to give weight to the possibility that the wind turbines will create additional risks for student pilots" because the FAA does not consider student pilots possibly violating the FAA established procedures or rules. However, this argument has no evidentiary support. The AZBA relies on Pegasus's expert, Bob Doyle. The AZBA alleges that Doyle stated that there might be "a situation where [a] pilot without those turbines might have been able to get into the airport and might have been able to safely land, and now all of a sudden, they can't because of the existence of turbines." However, the AZBA has taken the statement out of context. Doyle stated:

> I know that there was concern that was [sic] expressed that pilots taking off or landing at the airport might get into a bad situation and lose an engine. They ice up. They declare an emergency, whatever it might be, and these turbines might create a situation where that pilot without those turbines might have been able to get into the airport, and might have been able to safely land, and now all of a sudden, they can't because of the existence of the turbines. *I understand that's a concern, and I don't think it's—I don't think it's rooted in any sort of—it doesn't have any real basis to it.* And the reason I say that is that these turbines are going to be in amongst—in and amongst an existing wind farm, first of all. The routes that pilots are going to take in and out of that airport . . . the likelihood that that pilot's going to make a right turn toward the wind farm in trying to get back to the airport is not—it's not—it's not considered viable in my mind. There is a requirement to see and avoid. When we start talking about emergency operations in air traffic, the reliance really, the biggest factor that's going to separate . . . a live pilot from a dead pilot in an emergency really comes down to pilot training. It's the number one requirement. The FAA does not protect for emergencies for the very reason that

they are unpredictable. You don't know where they're going to happen . . . . There's been published papers on it and others coming out of FAA flight standards. So . . . to me, the safety argument here, there is no safety argument, because the FAA has addressed that. *This emergency argument is not rooted in any kind of real factual evidence. So that's my position on that.*

Doyle's conclusion is exactly the opposite of what the AZBA claims. Therefore, the AZBA's arguments regarding risks created by emergencies and student pilots lacks substantial evidence in the record.

With respect to VFR visibility and cloud clearance requirements, the county notes that VFR pilots "cannot fly at all during those times [when visibility is less than three miles or there are clouds] if the wind turbines are in their flight path." The county asserts that the testimony of Pegasus's expert that any alleged choke point was not a hazard because VFR pilots have not historically flown often at the airport in the lower visibility conditions that are affected by the presence of the turbines was insufficient because "VFR pilots may legally fly in the weather and visibility conditions at issue." The county then calculated that if VFR pilots did choose to fly at times of low visibility, using weather data to estimate those occurrences, VFR pilots would lose 447 daylight hours over 141 days if the turbines were permitted.

However, based on the statistical analysis of the expert and his testimony, the record indicates that VFR pilots are already not utilizing those hours and no one in the record has explained why. Without any evidence regarding why VFR pilots were already choosing not to fly during periods of low visibility, even though legally permitted to, the calculation of lost hours is meaningless.

The county argues that both Pegasus's expert and a pilot agreed that pilots would not try to weave in and out of the turbines. Accepting this argument as true, the testimony about a potential choke point carries no weight because the Variance Map, included below, makes clear that there are already numerous turbines in and around the airport. In the map, the black dots represent all of Pegasus's turbines and the circled dots represent the eight turbines for which variances were requested. The blue rocket shapes represent turbines that are already existing, which was also established through Pegasus's expert.



Legend
All
Height Variance and Increase CMDA
Increase CMDA
Obstacles - Wind Turbine > 200' AGL
Obstacles - Other > 200' AGL

Sources: Esri, HERE, Garmin, Intermap, increment P Corp., GEBCO, USGS, FAO, NPS, NRCAN, GeoBase, IGN, Kadaster NL, Ordnance Survey, Esri Japan, METI, Esri China (Hong Kong), (c) OpenStreetMap contributors, and the GIS User Community

The AZBA asserts that the record evidence "is replete with witness testimony and evidence showing the wind turbines would present a danger to pilots experiencing in-flight emergencies, create a conflict between visual flight rules (VFR) and cloud clearance requirements, and that primary radar would be impacted by the turbines." Although the record contains many assertions of things that "could" or "might" occur, and accepting all this evidence regarding things that could occur from the proposed turbines, there is still one very large, very significant hole in the record. Pegasus's wind expert explained that even if VFR pilots were flying in reduced visibility conditions, the eight turbines would have no impact on those pilots because they *would already* be having to circumnavigate the existing structures and turbines in the northwest quadrant of the airport area.

Along these same lines, the Variance Map calls into question the AZBA's argument regarding issues related to minimum flying altitudes and a potential choke point. According to the AZBA, "[t]he placement of wind turbines within th[e] 6.6 mile radius [of the airport] *would* require VFR pilots to fly" in different airspace, which would trigger different flight visibility requirements. According to the variance map, there are a large number of wind turbines that already exist or will soon exist within that radius. Presumably, those "future" conditions have already come to pass, and pilots have been dealing with them in relation to the other turbines for some time now. That there was no evidence placed in the record of an actual choke point occurring highly suggests that the AZBA's concerns regarding its potential lack merit. Moreover, if a choke point has yet to occur from the existence of the existing turbines in that area, and the fact that these eight turbines will be interspersed among those others already existing, it is unclear what it is, specific about these eight, that will create the choke point. The record does not contain any evidence supporting a finding that the addition of these eight turbines would or could create risks and situations different from what is already happening as a result of the numerous wind turbines already built. Therefore, on this record, no reasonable person could conclude that the addition of these eight turbines would

create the risks and concerns that the AZBA and county have identified.[9] *Hughes*, 284 Mich App at 60-61. Thus, the circuit court erred when it concluded that the AZBA's determination that Pegasus had not shown that the variances would not impact public safety or approach protections was supported by substantial, competent, and material evidence.

## 3. SUBSTANTIAL JUSTICE

Finally, defendants assert that the circuit court erred when it concluded that granting the variances would do substantial justice and found that there would be no adverse impact on the airport and there would be substantial benefit to the county. Generally, an appeal is limited to the issues raised by the appellant, unless the appellee files a cross-appeal. MCR 7.207; *Kosmyna v Botsford Community Hosp*, 238 Mich App 694, 696; 607 NW2d 134 (1999). Although defendants did not file a cross-appeal, they "need not file a cross[-]appeal in order to argue an alternative basis for affirming the trial court's decision, even if that argument was considered and rejected by the trial court." *Kosmyna*, 238 Mich App at 696.

In support of its position that the circuit court erred, the AZBA relies on an unpublished opinion from this Court for the premise that a showing of substantial justice requires a variance to be issued when no development can occur on the property because the owner has no economically viable use. See *Swiecicki v City of Dearborn*, unpublished per curiam opinion of the Court of Appeals, issued September 12, 2016 (Docket Nos. 262892; 263066), p 3. The AZBA contends that it has cited to an unpublished case "because it squarely addresses the standard for determining whether 'substantial justice' requires a variance to be issued—an issue directly in contention in this case." However, this argument lacks merit because nothing in *Swiecicki* sets forth a standard for a determination of "substantial justice" in the context of a nonuse variance, the unpublished case is not persuasive on this issue. MCR 7.215(C)(1). Additionally, the county merely "suggests" that the circuit court's affirmance in all other respects is inconsistent with its reversal on the substantial justice factor. "An appellant may not merely announce a position then leave it to this Court to discover and rationalize the basis for the appellant's claims; nor may an appellant give an issue only cursory treatment with little or no citation of authority." *Cheesman v Williams*, 311 Mich App 147, 161; 874 NW2d 385 (2015). By failing to provide any legal argument or analysis, the county has effectively abandoned any claim of error on this question. Lastly, neither the AZBA nor the county has actually addressed the basis of the circuit court's reversal on this issue. Therefore, we need not review defendants' claim. See *Derderian v Genesys Health Care Sys*, 263 Mich App 364, 381; 689 NW2d 145 (2004) ("When an appellant fails to dispute the basis of the trial court's ruling, this Court need not even consider granting plaintiffs the relief they seek.") (quotation marks, citation, and alterations omitted).

---

[9] This is not to say that the existence of numerous turbines in this area requires all future variance requests for turbines to be approved. There may be a point when the addition of more turbines will cause additional problems and risks or be detrimental to the area.

-20-

## D. SPIRIT OF THE ORDINANCE

Lastly, we conclude that the circuit court erred when it affirmed the AZBA's determination that the variances were not in the spirit of the ordinance.

According to the resolution, the spirit of the ordinance at issue is "to promote the health, safety, and welfare of the inhabitants of the County of Tuscola by preventing the establishment of airport hazards, restricting the height of structures and objects of natural growth and otherwise regulating the use of property in the vicinity of Tuscola Area Airport; [and] providing for the allowance of variances from such regulations." See Tuscola Ordinance § 1.2. The AZBA's decision provides, "In light of the aviation limitations and risks posed by the wind turbines, denial of the eight (8) variance applications is most consistent with the spirit of the Ordinance." In affirming the AZBA's decision, the trial court noted that

> [t]he limitations and risks posed by the proximity of wind turbines did not "promote the health, safety, and welfare" of the County's inhabitants in the way that the Ordinance identifies for promoting those values: "by preventing the establishment of airport hazards" and by "restricting the height of structures" in the vicinity of the Tuscola Area Airport.

However, we conclude that there was no substantial evidence to support the finding of "aviation limitations and risks posed by the wind turbines" on this record. The closeness of the eight proposed turbines to the numerous existing turbines and the lack of any evidence from anyone that any of these alleged concerns had come to pass as the result of the placing or use of the previously installed turbines within the airport's 6.6 mile radius precluded these alleged risks and limitations from supporting the AZBA's conclusion, and the AZBA provided nothing more in support of its position.

Although defendants assert that the ordinance provides for outright prevention of hazards rather than their minimization, the plain language of the ordinance expressly provides for the provision of variances, rendering the grant of variances equally within the spirit of the ordinance. In this case, other turbines had received variances, those turbines were sited within the airport's 6.6 mile radius, and no evidence was provided that their existence had created any of the purported "future" risks used by the AZBA to justify its decision. Given that the variance being requested was entirely consistent and in line with other land uses in the area, which also had to have met this standard, it is hard to think of a circumstance in which, once the other requirements for a variance are met, the spirit of the ordinance does not include granting the variance. Because the record does not show any substantial, material, or relevant evidence in support of the AZBA's assertion that the turbines create risks and limitations that somehow do not already exist from all of the other turbines, the AZBA's decision is without support and the circuit court erred by affirming it.

Reversed in part and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Michelle M. Rick
/s/ Douglas B. Shapiro